Filed 9/24/25
*See concurring opinion*

**CERTIFIED FOR PUBLICATION**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| PACIFIC BELL TELEPHONE COMPANY et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> COUNTY OF RIVERSIDE et al., <br><br> Defendants and Respondents; <br><br> DESERT WATER AGENCY et al., <br><br> Interveners and Respondents. | E083505 <br><br> (Super.Ct.No. CVRI2305294) <br><br> OPINION |

APPEAL from the Superior Court of Riverside County. Harold W. Hopp, Judge. Affirmed.

Munger, Tolles & Olson, Benjamin J. Horwich, Gabriel M. Bronshteyn, Faye Paul Teller, Kyle A. Groves, Andra Lim, Ginger D. Anders; Capitol Law and Policy and Eric J. Miethke for Plaintiffs and Appellants.

Gibson, Dunn & Crutcher, Bradley J. Hamburger, Shannon Mader and Nicholas Whetstone for California Senior Alliance, National Diversity Coalition, The Two

1

Hundred for Homeownership, Community Repower Movement, RestoreLA—CDC, California Consumer Advocates for Affordability and Safety, and the California Black Chamber of Commerce as amici curiae on behalf of Plaintiffs and Appellants.

Greenberg Traurig, Colin W. Fraser, Cris K. O'Neall and Bradley Marsh for California Taxpayers Association, Orange County Taxpayers' Association, California Business Roundtable, The Howard Jarvis Taxpayers Association, and the California Chamber of Commerce as Amici Curiae on behalf of Plaintiffs and Appellants.

Olson Remcho, Margaret R. Prinzing, Robin B. Johansen and Eric Lee for Defendant and Respondent County of Riverside.

Rob Bonta, Attorney General, Tamar Pachtar, Assistant Attorney General, Brian D. Wesley and Jarrad Wood, Deputy Attorneys General, for Defendant and Respondent State Board of Equalization.

Best, Best & Krieger, Chad D. Colton, Miles B. Krieger and Piero C. Dallarda for Intervenors and Respondents Desert Water Agency and Rancho California Water District.

Renne Public Law Group and Michael K. Slattery for California State Association of Counties as Amicus Curiae for Respondents.

INTRODUCTION

Pacific Bell Telephone Company and six other public utility companies (appellants) appeal from the judgment dismissing their tax refund lawsuit against the County of Riverside (County) after the trial court sustained the County's demurrer without leave to amend. Appellants sued the County for a partial refund of property

2

taxes, alleging that the "debt service component" of the County's property tax rate violates article XIII, section 19, of the California Constitution (Section 19). Appellants argue that the provision in Section 19 which states that utilities "shall be subject to taxation to the same extent and in the same manner as other property" constitutes a requirement that utilities must be taxed at the same rates as other nonutility or "common" real property. Appellants claim that the County violated that rate equality mandate by imposing on utility property a debt service component that exceeds the average debt service component for common property within the County.

Appellants have brought lawsuits similar to this one in several other counties across the state and, while this appeal was pending, three other appellate courts issued opinions concluding that Section 19 does not require that utility and common property be taxed at the same rates—*County of Santa Clara v. Superior Court* (2023) 87 Cal.App.5th 347 (*Santa Clara*), *Pacific Bell Telephone Co. v. County of Merced* (2025) 109 Cal.App.5th 844 (*Merced*), and *Pacific Bell Telephone Co. v. County of Napa* (2025) 112 Cal.App.5th 952 (*Napa*). Appellants contend that those opinions were wrongly decided and that the California Supreme Court held in *ITT World Communications, Inc. v. City and County of San Francisco* (1985) 37 Cal.3d 859 (*ITT*) that Section 19 mandates rate equality for utility and common property. We agree with our sister courts that Section 19 contains no such mandate and that *ITT* issued no such holding. We therefore affirm.

BACKGROUND

A. *California's Property Tax System*

Property in California is subject to value-based or "ad valorem" taxation at the county level. Ad valorem taxation "appl[ies] a property tax rate to the assessed value of property." (Rev. & Tax. Code, § 2202.) Our state's property tax system "follows a three-step process: (1) the value of taxable property is assessed, (2) the tax rate is computed, and (3) the tax is levied from the taxpayer." (*BNSF Ry. Co. v. Cty. of Alameda* (9th Cir. 2021) 7 F.4th 874, 879 (*BNSF*).) Property tax rates are calculated under statutory formulas enacted by the Legislature and contain the same two components: (1) a one-percent general tax to fund general services in the county, and (2) a debt service component, which is calculated to generate sufficient revenue to pay interest and principal on voter-approved indebtedness issued by certain local entities. (Cal. Const., art. XIII A, § 1, subd. (a); Rev. & Tax. Code, §§ 93, subd. (c) & 100, subd. (b)(1); see generally *BNSF*, at pp. 880-882.)

Within this basic framework, common and utility property are treated differently, with utility property being subject to what is called "unit taxation." (*ITT*, *supra*, 37 Cal.3d at p. 859.)

1. Taxation of Common Property

Common property is valued at the local level by the county assessor. (Rev. & Tax Code, § 404.) Proposition 13, a voter initiative enacted in 1978, limits the assessment of "real property" to its fair market value in 1975 or its later date of acquisition, with future adjustments capped at two percent. (Cal. Const., art. XIII A, § 2; see generally *ITT*,

4

*supra*, 37 Cal.3d at p. 859.)  Proposition 13 also limits the tax rate that can be applied to real property to:  (1) a general levy of no more than one percent, and (2) a debt service component sufficient to pay interest and principal on voter-approved indebtedness.  (Cal. Const., art. XIII A, § 1.)

After common property is assessed, its value is allocated to a jurisdiction for taxation.  Common property is assigned to the "tax rate area" (TRA) in which it is located.  A TRA is a geographic area that is served by the "same combination of local agencies and school entities for the current fiscal year."  (Rev. & Tax. Code, § 95, subd. (g)(1).)  The TRA controls which tax rate will be applied to the property.

Under Revenue and Taxation Code section 93, the debt service component for each TRA is calculated by determining the amount of revenue needed to make debt-service payments for the upcoming year, subtracting the revenue expected to be generated by utility property, and then calculating the tax rate necessary to service the debt based on the assessed value of common property in the TRA.  (Rev. & Tax. Code, § 93; Gov. Code, § 29100.)  Revenue and Taxation Code section 93's formula "ensures that each TRA will have enough revenue to make payments for the interest and principal on its bonded [or voter-approved] indebtedness."  (*BNSF*, *supra*, 7 F.4th at p. 880.)  Because "[a] county may have hundreds or thousands of TRAs," that county will likewise have "hundreds or thousands of different tax rates."  (*Id.* at pp. 880–881.)

2. Unit Taxation of Utility Property

Before 1935—when Section 19's predecessor, former article XIII, section 14 of the California Constitution (former Section 14), went into effect—public utilities were

5

not subject to local property taxes.  (*ITT*, *supra*, 37 Cal.3d at p. 862.)  Instead, utility property "was subject to a special gross receipts 'in lieu' tax levied and collected by the state to support state government," whereas all "other property was subject to the regular ad valorem property tax levied and collected by local government to support itself." (*ITT*, at p. 862; see *Southern California Tel. Co. v. County of Los Angeles* (1941) 45 Cal.App.2d 111, 114 ["From 1911 to 1934, inclusive, the property of public utilities was taxed in California by the imposition of taxes proportionate to gross receipts"].) With the enactment of former Section 14, utility properties became subject to a form of local ad valorem taxation called "unit taxation."  (*ITT*, at p. 862.)

Under unit taxation, the State Board of Equalization (the Board) annually assesses utilities using a valuation method called "unit valuation," which determines "the value of the public utility property as a going concern."  (*ITT*, *supra*, 37 Cal.3d at p. 864; Rev. & Tax. Code, § 723.)  "First, the Board annually assesses all unitary property of each public utility, that is, all property that it uses in performing its function.  ([Rev. & Tax. Code,] § 723.)  In making this assessment, the Board . . . determines the value of the property as a whole, rather than the value of any of the assets as parts of the whole; it does not assess each asset and then total up the valuation, but values the property as a unit, primarily through a capitalized earnings approach.  Second, the owner of the public utility property is offered an opportunity to apply for corrections.  ([Rev. & Tax. Code,] §§ 731, 741–749.)  Third, the Board transmits to the local taxing authority a roll showing the assessments against public utility property situated within its jurisdiction.  ([Rev. & Tax. Code,] §§ 755–756, 758.)"  (*ITT*, at pp. 863-864.)

"In accordance with the principle of unit valuation, such assessments do not represent the value of the assets situated within that jurisdiction; rather, they represent the share of the value of the property as a whole that the Board has determined should equitably be allocated to the jurisdiction.  Thus, after it has assessed the value of the property as a whole, the Board makes a formulary allocation that *has little or no relationship to the actual fair market value* of the particular assets situated within the jurisdiction."  (*ITT*, *supra*, 37 Cal.3d at p. 864, italics added, citing Rev. & Tax. Code, §§ 725, 731, 741–749, 755-756.)

The next step in unit taxation is formulation of the tax rate.  As noted, utility property is subject to the same one-percent general tax as common property.  However, unlike common property, utility property is assigned to a single, countywide TRA. Revenue and Taxation Code section 100 provides:  "Each county shall establish one countywide tax rate area.  The assessed value of all unitary . . . property shall be assigned to this tax rate area.  No other property shall be assigned to this tax rate area."  (§ 100, subd. (a).)

Before the enactment of Revenue and Taxation Code section 100's predecessor (former section 98.9) in 1986, utility property was assigned to the specific TRA in which it was located.  "The Legislature enacted section 100—formerly section 98.9—in 1986, in part to address the administrative burden that this tax system created for state-assessed unitary property and entities like the utilities that would receive potentially hundreds or thousands of tax bills from the various tax rate areas within a county, at varying rates." (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 363, citing *BNSF*, *supra*, 7 F.4th at p. 881.)

"Due to a lengthy legislative history, unitary property holders do not need to demonstrate the TRAs in which their property is located. Instead, their countywide value is allocated to a countywide TRA with a single tax rate." (*BNSF*, *supra*, 7 F.4th at p. 881.)

Because the utility debt service component formula must account for the voter-approved indebtedness of the entire county in which the utility property is located, the formula differs from Revenue and Taxation Code section 93's TRA-based formula for common property. Under Revenue and Taxation Code section 100, the debt service component for utility property is calculated by taking the county's previous year's unitary debt service component and multiplying it by the percentage change in the county's aggregate debt service levy over the prior two fiscal years. (See *BNSF*, *supra*, 7 F.4th at pp. 881-882.)

B. *Appellants' Lawsuit*

Appellants consist of seven privately owned public utility companies that operate in this state: Pacific Bell Telephone Company; AT&T Mobility LLC; AT&T Corp.; Sprint Communications Company, L.P.; Sprint Spectrum, L.P.; T-Mobile West LLC; and CenturyLink Communications LLC. In October 2023, appellants filed a complaint against the County seeking a partial refund of property taxes for fiscal years 2018-2019 through 2022-2023.

The complaint alleged that, for each of those years, the debt service component that the County imposed on appellants under Revenue and Taxation Code section 100 "exceeded" the "average" debt service component that the County imposed on common property under Revenue and Taxation Code section 93. For example, in 2018,

8

appellants' debt service component was 1.7292 percent, whereas the countywide average debt service component for common property was 1.171 percent. The complaint alleged that the County's debt service component for utility property violated the provision in Section 19 which states that utility property "shall be subject to taxation to the same extent and in the same manner as other property." According to appellants, that provision means that utility and common property must be taxed at the same rates. The complaint sought total refund of over $11.8 million and a judicial declaration "that the tax rate applied by the County to [appellant's] state-assessed property in excess of the average property tax rate in the County violates section 19 of Article XIII of the California Constitution."

The trial court allowed two water districts that operate within the County—Desert Water Agency and Rancho California Water District (intervenors)—to intervene in the action because they depend on property tax revenue collected by the County to pay their bonded indebtedness.

C. *The* Santa Clara *Decision and the County's Demurrer*

Several months before appellants filed this lawsuit, our colleagues in the Sixth District issued the *Santa Clara* decision, which rejected appellants' interpretation of Section 19. In that case, a similar group of utility companies argued that Santa Clara County's debt service component for utility property violated Section 19 because it exceeded the countywide average debt service component for common property. (*Santa Clara*, *supra*, 87 Cal.App.5th at pp. 355-356.) After analyzing the text, structure, and history of Section 19, *Santa Clara* concluded that the provision at issue was not meant to

9

protect utility companies from higher tax rates than common property but was instead intended to provide relief for the common property tax payer by enabling the taxation of utilities by local governments. (*Id.* at p. 369.) Specifically, *Santa Clara* held that the provision does not mandate that utility and common property be taxed at the same rate but rather renders utility property subject to ad valorem taxation by local governments instead of in lieu taxation by the state. (*Ibid.*) In addition, *Santa Clara* rejected the argument that in *ITT* our Supreme Court interpreted the provision to require rate equality among the two types of property. (*Id.* at pp. 370-371.)

Relying on *Santa Clara*, the County demurred to the complaint, arguing that the trial court was bound by the Sixth District's decision. Appellants conceded that *Santa Clara* was binding and required dismissal, but they maintained that they had a good faith basis to challenge the opinion on appeal. The trial court agreed that *Santa Clara* was binding, sustained the County's demurrer without leave to amend, and entered judgment in favor of the County.

D. *The* Merced and Napa *Decisions*

After the parties filed their briefs in this appeal, our colleagues in the Fifth District issued *Merced*, which agreed with *Santa Clara*. *Merced* concluded that Section 19 "was intended as an enabling clause, making property taxable that, before, was not taxable" and was "not intended as a limiting clause, preventing utility property from ever being taxed at a rate higher than common property." (*Merced*, *supra*, 109 Cal.App.5th at pp. 851, 866-867.) *Merced* also agreed with *Santa Clara* concerning the scope of *ITT*'*s* holding. (*Id*. at p. 853.) We granted appellants' request to file supplemental briefs

10

addressing the *Merced* decision.[1]  After we issued our tentative decision, our colleagues in the First District issued *Napa*, which agreed with *Santa Clara* and *Merced* on the interpretation of both Section 19 and *ITT*'s holding.[2]  (*Napa*, *supra*, 112 Cal.App.5th at pp. 958-959, 964-965.)

DISCUSSION

A.  *Standard of Review and Interpretive Guidelines*

Where, as here, an appeal following demurrer presents legal issues only, our standard of review is de novo.  (*Merced*, *supra*, 109 Cal.App.5th at p. 853, citing *Limon v. Circle K Stores Inc.* (2022) 84 Cal.App.5th 671, 688.)  The sole issue in this appeal "is a question of law involving constitutional interpretation"—namely, whether Section 19 mandates rate equality between utility and common property.  (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 358.)  If Section 19 contains such a mandate, then Revenue and

---

[1]  We also granted three requests to file amicus curiae briefs.  California State Association of Counties filed a brief supporting the County, and the following two groups filed briefs supporting appellants—(1) California Senior Alliance, National Diversity Coalition, The Two Hundred for Homeownership, Community Repower Movement, RestoreLA–CDC, California Consumer Advocates for Affordability and Safety, and the California Black Chamber of Commerce, and (2) California Taxpayers Association, Orange County Taxpayers' Association, California Business Roundtable, the Howard Jarvis Taxpayers Association, and the California Chamber of Commerce.

[2]  Our colleagues in the Third District have also issued an opinion rejecting appellants' claims for rate equality or "comparability," but for a different reason.  In *Pacific Bell Telephone Co. v. County of Placer* (2025) 111 Cal.App.5th 634, the court concluded that—interpretation of Section 19 aside—appellants' claims failed as a matter of law because appellants failed to (1) present a cogent argument for "*identical* rates being constitutionally required" and (2) present "any means to determine [rate] *comparability*" (*id.* at pp. 644, 648, italics added).

11

Taxation Code section 100's formula for calculating the debt service component for utilities is unconstitutional as applied to appellants for the fiscal years at issue.

Section 19 is a constitutional provision drafted by the Legislature and enacted by the voters. (*Santa Clara*, *supra*, 87 Cal.App.5th at 359.) When analyzing such a provision, "the voters' intent governs." (*Ibid*.) We begin with the provision's text, "understood within the context of its enactment, 'because that is typically the best and most reliable indicator of the voters' intent.' " (*Merced*, *supra*, 109 Cal.App.5th at p. 857, quoting *In re Febbo* (2020) 52 Cal.App.5th 1088, 1097.) "We start by ascribing to words their ordinary meaning, while taking account of related provisions and the structure of the relevant statutory and constitutional scheme." (*California Cannabis Coalition v. City of Upland* (2017) 3 Cal.5th 924, 933 (*Upland*).) "If a review of the text and structure of the provision does not resolve the issue, we may consider extrinsic sources, such as legislative history in the case of a statute or, in the case of a [voter] initiative, the accompanying ballot materials." (*Merced*, at p. 857, citing *Upland*, *supra*, at pp. 933-934.)

Additionally, when determining whether Section 19 "denies the Legislature the authority to enact the formula set out in" Revenue and Taxation Code section 100, we must be mindful of the principle that constitutional limitations on legislative power " ' " 'are to be construed strictly' " ' " and " ' " 'are not to be extended to include matters not covered by the language used.' " ' " (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 358, citing *California Redevelopment Assn. v. Matosantos* (2011) 53 Cal.4th 231, 253.) " '[T]he legislative power the state Constitution vests is plenary. Under it, "the entire

12

law-making authority of the state, except the people's right of initiative and referendum, is vested in the Legislature, and that body may exercise any and all legislative powers which are not expressly or by necessary implication denied to it by the Constitution." ' " (*Santa Clara*, at p. 358.) As a result, if there is " ' "doubt as to the Legislature's power to act in any given case, the doubt should be resolved in favor of the Legislature's action." ' " (*Pac. Legal Found. v. Brown* (1981) 29 Cal.3d 168, 180.)

B. *Section 19 Does Not Require the Same Tax Rates for Utility and Common Property*

Section 19 was enacted "to authorize the unit taxation of public utility property" by counties so as to ensure " 'adequate valuation of utility property.' " (*ITT*, *supra*, 37 Cal.3d at p. 870.) Prior to its enactment, utilities were not subject to local property taxes. (*Id.* at p. 862) To interpret the provision, it is helpful to understand the historical context in which it was enacted.

1. History of Utility Property Taxation in California

In *ITT*, our Supreme Court summarized the history of utility property taxation as follows:

"In 1935 the current system of ad valorem unit taxation of public utility property, now defined by [Section 19] and Revenue and Taxation Code section 721 et seq., came into effect. Under this system all property, other than franchises, owned or used by public utilities is annually assessed and subjected to taxation. (Cal. Const., art. XIII, § 19; [Rev. & Tax. Code,] §§ 721–722, 755–756.) Under the system that had prevailed from 1910 into the 1930's, there was a separation of sources of tax revenue: public utility property was subject to a special gross receipts 'in lieu' tax levied and collected by

the state to support state government, and other property was subject to the regular ad valorem property tax levied and collected by local government to support itself. (Bertane, *The Assessment of Public Utility Property in California* (1973) 20 UCLA L.Rev. 419, 423–424 (hereinafter Bertane, *Public Utility Property*).)

"By the early 1930's, however, the Great Depression had brought about a crisis in taxation as in other aspects of public and private life, and there arose general dissatisfaction with this system of taxation. Local tax rates were believed to be too high, in part because public utility property was not on the local tax rolls; state revenues were believed to be too low, in part because public utility tax rolls could be raised only by a two-thirds vote of the Legislature (Cal. Const., former art. XIII, § 14, subd. (f)) and the public utilities possessed sufficient political power to block such tax increases (see Rep. of State Bd. of Equalization for 1931–1932 (1932) p. 12). In the face of this crisis, the Legislature drafted, and the voters adopted, an amendment to the Constitution known as the Riley-Stewart Plan, which completely revised this system of taxation. The special gross receipts 'in lieu' tax was repealed and public utility property was subjected to the regular ad valorem property tax, thus restoring public utility values to the local tax rolls and alleviating the local tax burden; the political problems inherent in taxing public utilities at the state level pursuant to legislatively set rates were eliminated by having public utility property centrally assessed by the Board.

"One of the primary objectives of the system of unit taxation of public utility property is to ascertain and reach with the taxing power the entire real value of such property. (See Plan for Tax Relief presented in Sen. Const. Amend. No. 30 and Assem.

14

Const. Amend. No. 68 to be Submitted as Prop. 1 on Ballot of June 27, 1933, p. 8 (hereinafter Plan for Tax Relief); Bertane, *Public Utility Property*, *supra*, 20 UCLA L.Rev. at pp. 426–427, 433.)  It has long been recognized that 'public utility property cannot be regarded as merely land, buildings, and other assets.  Rather, its value depends on the interrelation and operation of the entire utility as a unit.  Many of the separate assets would be practically valueless without the rest of the system.  Ten miles of telephone wire or one specially designed turbine would have a questionable value, other than as scrap, without the benefit of the rest of the system as a whole.'  (Bertane, *Public Utility Property*, *supra*, at p. 433.)  Unit taxation prevents real but intangible value from escaping assessment and taxation by treating public utility property as a whole, undifferentiated into separate assets (land, buildings, vehicles, etc.) or even separate kinds of assets (realty or personalty)."  (*ITT*, *supra*, 37 Cal.3d at pp. 862-863, fns. omitted.)

With this background in mind, we turn to the text of Section 19.

2.  Textual Interpretation

Section 19 was enacted in 1933 as former Section 14 and was revised in 1974, "but the changes were nonsubstantive in nature."  (*Merced*, *supra*, 109 Cal.App.5th at p. 860.)  Section 19 states in its entirety:

"The Board shall annually assess (1) pipelines, flumes, canals, ditches, and aqueducts lying within 2 or more counties and (2) property, except franchises, owned or used by regulated railway, telegraph, or telephone companies, car companies operating on railways in the State, and companies transmitting or selling gas or electricity.  *This*

15

*property shall be subject to taxation to the same extent and in the same manner as other*

*property.*

"No other tax or license charge may be imposed on these companies which differs from that imposed on mercantile, manufacturing, and other business corporations. This restriction does not release a utility company from payments agreed on or required by law for a special privilege or franchise granted by a government body.

"The Legislature may authorize Board assessment of property owned or used by other public utilities.

"The Board may delegate to a local assessor the duty to assess a property used but not owned by a state assessee on which the taxes are to be paid by a local assessee." (Italics added.)

The parties' dispute concerns the italicized language—the second sentence of Section 19.[3] Appellants argue that the phrase " 'to the same extent and in the same

---

[3] The parties have asked us to take judicial notice of various legislative history materials regarding Section 19, former Section 14, and Revenue and Taxation Code section 100 and former section 98.9. However, because a request for judicial notice of published legislative history material "is unnecessary" and "[c]itation to the material is sufficient," we treat "the request for judicial notice as a citation to those materials." (*Madrigal v. Hyundai Motor America* (2025) 17 Cal.5th 592, 609, fn. 10.) We grant appellants' request that we take judicial notice of (1) exhibits 6 through 13 of their April 29, 2024, request as those documents are official published records of the Legislature (Evid. Code, § 452, subd. (c)); and (2) the dictionary excerpts in exhibit 20 of their April 29, 2024 request and exhibits 7 and 8 of their November 4, 2024 request (see Evid. Code, § 451, subd. (e)). We deny the remainder of appellants' requests for judicial notice, which pertain to briefs and petitions filed in other cases and excerpts from SBE's 2016 State Assessment Manual because those documents are unnecessary to our resolution of this appeal. (*County of San Diego v. State of California* (2008) 164 Cal.App.4th 580, 613, fn. 29.)

16

manner' " means "at the same tax rate." The County, joined by intervenors, argues that the phrase was intended to repeal the system of in lieu taxation and replace it with the same system of taxation that applied to common property. Under their interpretation, the second sentence of Section 19 dictates the type of taxation (i.e., local as opposed to state and ad valorem as opposed to in lieu) but not the specific tax rate.

As noted, three appellate opinions, *Santa Clara*, *Merced*, and *Napa* have interpreted the language at issue in the same context as here—that is, whether a county's debt service component for utility property can exceed the countywide average debt service component for common property. (See *Santa Clara*, *supra*, 87 Cal.App.5th at pp. 355-357; *Merced*, *supra*, 109 Cal.App.5th at pp. 850-852; *Napa*, *supra*, 112 Cal.App.5th at p. 965.) *Santa Clara* and *Merced* recognized that the phrase " 'to the same extent and in the same manner' " is ambiguous when read in isolation. (*Santa Clara*, at p. 364; *Merced*, at p. 858.) However, the opinions concluded that, when the phrase is viewed within "the broader context of article XIII of the California Constitution as a whole," it "becomes apparent that the drafters did not intend for the phrase to mean 'at the same rate.' " (*Santa Clara*, at p. 365; *Merced*, at p. 858.) *Napa* "s[aw] no reason to depart from th[o]se well-reasoned decisions," and neither do we. (*Napa*, *supra*, 112 Cal.App.5th at p. 968.)

On its own, the phrase "to the same extent and in the same manner" is ambiguous. On the one hand, the words "same extent" and "same manner" could reasonably be interpreted to mean "same rate." On the other hand, because the word "rate" does not appear in the second sentence, and because Section 19 "completely revised" the way

17

utilities are taxed (*ITT*, *supra*, 37 Cal.3d at p. 863), the words could also reasonably be interpreted to refer to the *type* of taxation (i.e., ad valorem property taxation, as opposed to in lieu taxation) and not to the *rate* of taxation. The ambiguity resolves, however, when we consider the words in alongside Section 19 as a whole, other tax provisions in article XIII, and the intent of the voters who enacted the provision.

Section 19 is part of article XIII of the California Constitution, which governs the general subject of taxation. Section 19, more specifically, governs the taxation of utilities and other companies subject to unit taxation. Section 19 is organized as follows: The first and second sentences concern utility property assessment and taxation, respectively; the third sentence concerns the taxes and license charges applicable to the companies themselves; and the last two sentences contain "specific permissions for the Legislature to enact additional laws and the Board to delegate." (*Merced*, *supra*, 109 Cal.App.5th at p. 859.) In our view, the following aspects of Section 19 and of article XIII resolve the potential ambiguity in Section 19's second sentence.

We begin with Section 19's third sentence, which prohibits the imposition of any "other tax or license charge . . . *which differs* from that imposed on mercantile, manufacturing, and other business corporations." (Art. XIII, § 19, italics added.) The meaning of that sentence is unambiguous. It provides that the business taxes and license charges imposed on the companies "must not differ" from those imposed on "other comparable business corporations." (*Pacific Gas & Electric Co. v. City of Oakland* (2002) 103 Cal.App.4th 364, 372 [city's imposition of business tax on a utility company at higher rate than on retail and other businesses violated Section 19].)

18

We agree with *Santa Clara* that the fact that "[t]he second sentence does not say, as the third sentence does, that [property] taxes or rates must not differ" suggests that the property tax rates for utility property "may differ" from those applied to common property. (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 365.) We also agree with S*anta Clara* that the use of the word "other" in the phrase "[n]o '*other* tax or license charge . . .' may differ" further suggests that—in contrast to the business taxes and charges addressed in the third sentence—the property taxes addressed in the second sentence may differ. (*Id.* at p. 366.) The third sentence of Section 19 thus indicates that its drafters "knew how to draft affirmative limitations restricting the ability to tax utilities when they intended to provide them." (*Merced*, *supra*, 109 Cal.App.5th at p. 858.)

Next, we find it significant that the second sentence uses the phrase "shall be subject to taxation," rather than stating that such property "shall be taxed" to the same extent and in the same manner as other property. (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 366; *Merced*, *supra*, 109 Cal.App.5th at pp. 859-860.) As both *Santa Clara* and *Merced* observed, those two phrases appear to mean different things in article XIII. For example, both phrases are used in section 11, subdivision (f), of article XIII, which concerns land owned by local governments and which was "part of the same 1974 enactment that made non-substantive revisions to [S]ection 19." (*Santa Clara*, at p. 366.) Section 11 states that "[a]ny taxable interest of any character, other than a lease for agricultural purposes and an interest of a local government, in any land owned by a local government that is *subject to taxation* pursuant to Section 11(a) of this Article *shall be taxed* in the same manner as other taxable interests." (Cal. Const., art. XIII, § 11,

19

subd. (f), italics added.)  We agree with our sister courts that the two phrases "plainly do not mean the same thing in the context of section 11" and that the use of both phrases shows that "the drafters recognized the distinction between being 'subject to taxation' and actually being taxed." (*Santa Clara*, at pp. 366-367; *Merced*, at pp. 859-860.)

Moreover, we think *Merced* is correct that the phrase "subject to taxation" describes "a general state of the property allowing it to be taxed, not the taxes or rates to which that property will actually be subject." (*Merced*, *supra*, 109 Cal.App.5th at p. 859.)  "Stating certain property of certain utilities shall be 'subject to taxation' generally enables the taxation of that property.  It does not detail how that property will be taxed.  Comparatively, saying property 'shall be taxed' in a certain manner does prescribe how the property will be taxed." (*Ibid.*)

Other sections of article XIII contain language plainly intended to detail how property will be taxed, and those provisions use notably different phrasing than that contained in Section 19's second sentence.  For example, article XIII, section 2, which concerns personal property taxes and which was enacted at the same time as Section 19's predecessor, states that the tax on certain personal property "shall not exceed four-tenths of one percent of full value, and the tax per dollar of full value *shall not be higher* on personal property than on real property in the same taxing jurisdiction." (Cal. Const., art. XIII, § 2, italics added.)  We agree with *Merced* that "this is clearly a rate cap, indicating the drafters knew how to draft a rate cap when they wished to implement one." (*Merced*, *supra*, 109 Cal.App.5th at p. 858, fn. 7.)

Appellants take issue with this interpretation of "subject to taxation," arguing that *Santa Clara* and *Merced* invented a "twilight stage of the ad valorem property tax system that nobody believes exists and in which nothing of legal consequence occurs." Appellants contend that there are only two stages of ad valorem property taxation—assessment and taxation—and that the first two sentences of Section 19 concern those stages, respectively. Thus, in appellants' view, it would make no sense if the second sentence's purpose was to simply render utility property taxable. Instead, appellants claim, the sentence must have been intended to detail how the property is to be taxed, which in turn suggests that "to the same extent" means "at the same rate."

We are not persuaded. As *Merced* explained: "There obviously is such a space between assessment and taxation, in which property is taxable, but not necessarily taxed. Section 19 does not itself impose a tax or require that one be imposed on utility property, but rather enables it to be taxed. Property 'subject to taxation' is property which can be taxed. It does not mean it *is* taxed. . . . The legal consequence of certain property being subject to taxation is that relevant legislative bodies with taxing powers may thereafter impose taxes on that property." (*Merced*, *supra*, 109 Cal.App.5th at p. 860.) In our view, appellants' argument overlooks the fact that Section 19 "chang[ed] decades of tax law in which utilities were simply not subject to property taxes." (*Merced*, at p. 859.) When Section 19 is considered in its historical context, we agree with Merced that "[i]t makes perfect sense to include such enabling language" in the second sentence. (*Merced*, at p. 859.)

21

Finally, the language of Section 19's predecessor, former Section 14, supports the conclusion that the second sentence does not contain a rate limitation. "As our Supreme Court noted in *ITT*, Section 19, which was formerly section 14, was revised in 1974, but the changes were nonsubstantive in nature and thus the original language provides a relevant interpretive guide." (*Merced*, *supra*, 109 Cal.App.5th at p. 860, citing *ITT*, *supra*, 37 Cal.3d at p. 870, fn. 6.) The provision of former Section 14 concerning unit taxation used identical phrasing as the second sentence of Section 19. However, the provision concerning "other taxes and license charges" stated that utility companies "shall be taxed *in the same manner and at the same rates* as mercantile, manufacturing and business corporations and their franchises are taxed pursuant to section 16 of this article." (Cal. Const., former art. XIII, § 14, italics added.) That provision also stated that "that no excise or income tax or any other form of tax or license charge shall be levied or assessed upon or collected from the companies . . . in any manner or form, different from, *or at a higher rate than* that imposed upon or collected from mercantile, manufacturing and business corporations doing business within this State." (*Ibid.*, italics added.)

We find it significant that Section 19's predecessor used the word "rate" twice in the context of the business taxes but not at all in the context of property taxes. As *Merced* explains, former Section 14 "clearly did require an equality of tax rates, but only between business taxes on utilities and other businesses, [and] not between utility property and common property." (*Merced*, *supra*, 109 Cal.App.5th at p. 861.) When language is included " 'in one section of a statute but omit[ted] . . . in another,' "

22

we presume the drafter " 'intended a difference in meaning.' " (*Dig. Realty Trust, Inc. v. Somers* (2018) 583 U.S. 149, 161; see *County of Alameda v. Workers' Comp. Appeals Bd.* (*Knittel*) (2013) 213 Cal.App.4th 278, 285 [The Legislature's use of different phrases "was not an idle act."].)  That the original version of Section 19 used the phrase " 'in the same manner *and at the same rate*s' " for corporate taxes but used the phrase " 'to the same extent and in the same manner' " for property taxes, is strong evidence that " 'to the same extent' " does not mean " 'at the same rates.' " (*Merced*, *supra*, 109 Cal.App.5th at p. 861; *Santa Clara*, *supra*, 87 Cal.App.5th at p. 368 ["We must presume the drafters intended that these different phrases have different meanings."].)

For all of these reasons, we agree with *Merced's* conclusion that "the language, structure, and history of nonsubstantive changes to Section 19" remove any ambiguity from the provision at issue.  (*Merced*, *supra*, 109 Cal.App.5th at p. 862.)  The phrase " '[t]his property shall be subject to taxation to the same extent and in the same manner as other property" does not contain a rate limitation but rather operates as "an enabling clause that renders certain property of certain utilities, which previously could not be taxed [by local governments], taxable in nature.' " (*Ibid.*)

In addition we also agree with *Santa Clara* and *Merced* that the legislative history of Section 19 lends further support to that interpretation.  (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 366; *Merced*, *supra*, 109 Cal.App.5th at p. 862.)  As noted, when examining the legislative history of a measure submitted to the voters by ballot, " 'courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure.' " (*Merced*, *supra*, 109 Cal.App.5th at p. 862, citing

*People v. Superior Court (Pearson)* (2010) 48 Cal.4th 564, 571; see *Citizens to Save California v. California Fair Political Practices Com.* (2006) 145 Cal.App.4th 736, 747 [When interpreting ballot measures, courts turn to " ' "indicia of the voters' intent, particularly the . . . official ballot pamphlet." ' "].)

The ballot materials for former Section 14, presented to the voters in 1933, included an argument in favor of the constitutional amendment that told the voters that California was experiencing a "tax crisis" due to "the tremendous amount of frozen assets that can not be liquidated because of the terrific burden of unsound and confiscatory taxation."  The argument described the amendment as follows:  "Senate Constitutional Amendment Number 30 is a well considered revision of California's revenue system that is submitted to the voters of this State for the purpose of equalizing taxation and affording relief to taxpayers."  The argument explained that the amendment would "return $1,900,000,000 actual value of public utility property to the tax rolls for the support of local government" and "reliev[e] local taxpayers to the extent of $37,000,000 annually."  The argument concluded, "Vote YES on Number One on the ballot and save California's homes and farms from confiscatory taxation."

As for the ballots themselves, they contained a summary of the amendment, followed by the amendment's text.  The summary stated:  "Commencing 1935 requires property of public utility companies assessed by State Board of Equalization and taxed locally for local purposes as other property, taxing their franchises and income for State purposes like business corporations."  As noted above, the text of Section 19's predecessor, former section 14, contained separate provisions for the property taxes and

24

business taxes applicable to utilities and other companies with state-assessed property. The text stated that utility property "shall be subject to taxation to the same extent and in the same manner as other property," whereas the companies themselves "shall be taxed in the same manner and at the same rates as mercantile, manufacturing and business corporations and their franchises are taxed."

As *Merced* observed, the ballots reveal that the voters were "told that utility property would be subject to taxation in the same manner as was their common property, which had not been true for more than two decades" and that, notably, "[n]o express mention was made about the rates which would be imposed." (*Merced*, *supra*, 109 Cal.App.5th at p. 863.) By contrast, when the voters were informed that "utilities were also to be taxed as business corporations," they were expressly told that "those taxes were required to have equivalent tax rates." (*Ibid.*) Given the different descriptions of the two types of taxes in the ballot materials, we agree with *Merced* that "the inclusion of a rate equivalency requirement in one section that was pointedly omitted from the section immediately preceding it is good evidence the voters were not told about, and therefore did not intend to enact, property tax rate protectionism for the utility companies in this ballot measure." (*Ibid.*)

Having reviewed the ballots and ballot materials, we also agree with *Santa Clara's* conclusion that Section 19's legislative history supports the conclusion that the constitutional amendment "had nothing to do with mandating equal tax rates" for utility and common property but instead was designed—as our Supreme Court recognized in *ITT*—to " 'restor[e] public utility values to the local tax rolls and alleviat[e] the local tax

25

burden.' " (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 368, quoting *ITT*, *supra*, 37 Cal.3d at p. 863; see *Merced*, *supra*, 109 Cal.App.5th at p. 860 [concluding that Section 19's legislative history "points toward the relevant language being enabling, not limiting"].)

Appellants contend that the legislative history of Section 19 evinces instead an intent to ensure that utility and common property were subject to the same tax rates. In support, appellants rely on two documents that recommended taxing utility and common property at the same rates—(1) a 1927 report prepared by the California Tax Commission and (2) a 1933 report of recommendations for the Legislature by Ray L. Riley, State Controller, and Fred E. Stewart, Director of the Tax Research Bureau and a member of the State Board of Equalization, entitled "Summary of a Plan for Revision of California's Revenue System to Effect a Reduction in Property Taxes and a Limitation on Governmental Expenditures."

Because there is no indication that those documents were ever provided to the voters, we agree with *Merced* that they are not as helpful as the ballot and the ballot materials in determining the voters' intent. (*Merced*, *supra*, 109 Cal.App.5th at p. 864.) "While we presume the voters were aware of what the law was at the time a ballot measure is put forward, [citation], we see no reason to presume they were aware of the various reports, drafts, or analyses that had circulated within the Legislature and various administrative agencies in the years preceding the measure. Because Section 19 was adopted by ballot measure, it is the intent and understanding of the voters that is key. [Citations.] And while we may look to the 'the contemporaneous construction of the Legislature or of the administrative agencies charged with implementing the new

26

enactment' for interpretive guidance, [citation], this typically considers implementing decisions occurring after the ballot measure passes. [Citation.] Preexisting documents which were never provided to the voters are of significantly less help in guiding our interpretation." (*Ibid.*)

Appellants also rely on a document entitled "A Plan for Tax Relief," which was published by the Special Legislative Joint Tax Committee and was part of the legislative analysis compiled prior to the Legislature's decision to submit former Section 14 to the voters. (A Plan for Tax Relief presented in Sen. Const. Amend. No. 30 and Assem. Const. Amend. No. 68 to be submitted as Prop. 1 on Ballot of June 27, 1933 ("Plan").) Appellants argue that the Plan demonstrates that the proposed amendment was designed to ensure the same tax rates for utility and common property, but we read the document differently.

The Plan set forth the Special Legislative Joint Tax Committee's (the committee) recommendations for addressing California's "tax problems" and for "balancing the budget." (Plan, p. 5.) As background information, the Plan provided the following description of the growing "[d]issatisfaction" with the current system of property taxation: "Equalization of tax burdens as between utility property . . . and common property . . . has been a source of constant controversy. Studies have been made to determine tax burdens in terms of actual value of property imposed on these two classes of taxpayers. Legislation to adjust gross receipts rates accordingly has been bitterly opposed by the utility interests. Dissatisfaction with the system seems to have become general." (*Id.*, p. 11.) The Plan explained that "[o]ne of the most serious criticisms of the

27

general property tax as enforced prior to 1910 was that utility property could not be adequately valued under the existing administrative provisions. Save with reference to the roadbed, rails, right of way, rolling stock and franchises of railroads operating in more than one county, all utility property was valued by local assessors, who had no means of securing complete data regarding such large holdings." (*Id.*, p. 12.)

To address these issues, the Plan recommended that the Legislature propose a constitutional amendment providing "[t]he restoration to the local tax rolls of public utility property of the value and excess of $1,338,000,000." (Plan, p. 5.) Specifically, the Plan recommended "returning utility property to the local tax rolls to be taxed in the same way that other property is taxed, thereby broadening the local tax base by one-sixth, with corresponding tax reduction for the common property owner." (*Id.*, p. 8.) Noting the "difficulties involved in changing from one tax system to another," the Plan also recommended deferring the operative date of the amendment for two years and "requir[ing] the public utilities to pay additional taxes during that period, for maintaining the State Government." (*Id.*, p. 8.) In making those recommendations, the Plan noted that "[o]ne of the most serious criticisms of the general property tax as enforced prior to 1910 was that utility property could not be adequately valued under the existing administrative provisions." (*Id.*, p. 12.) The Plan explained that the proposed amendment would address that criticism by "[a]ssur[ing] adequate valuation of utility property by providing for its central assessment by the State Board of Equalization with full apportionment back to the several localities where the property is situated." (*Id.*, at p. 8.) Finally, the Plan expressly stated that "Tax relief *to common property owners*,

28

particularly farmers" was the "main purpose of Senate Constitutional Amendment No. 30." (*Ibid.*)

Appellants rely on the Plan's reference to the " '[e]qualization of tax burdens as between utility property . . . and common property' " to argue that the purpose of the amendment was ensuring the same tax rate for utility and common property. But in light of the Plan's express focus on providing tax relief to the common taxpayer (with special emphasis on farmers), we agree with *Merced* that the reference to equalizing the tax burden as between the two types of property "meant taxing utilities more heavily, not ensuring their tax rates never exceeded those of common taxpayers." (*Merced*, *supra*, 109 Cal.App.5th at p. 866.)

Additionally, we note that *ITT* reached the same conclusion as we and our sister courts do about Section 19's legislative history. On the basis of the Plan and other historical documents, our Supreme Court observed that the widespread dissatisfaction with California's property tax system that existed before former Section 14's enactment stemmed from the perception that common property was being taxed too heavily because utility property was not on the local tax rolls and that local assessment of utility property would not capture its full value. (*ITT*, *supra*, 37 Cal.3d at p. 863.) Those problems "were remedied by having the state assess utility property statewide as a going concern to capture its value fully, and then allowing the local jurisdictions to levy and collect taxes on that value to bolster the local tax rolls and relieve the burden on other local taxpayers." (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 369.) As *Santa Clara* aptly observed, "[m]andating application of identical tax rates was not necessary to address

29

those problems, and there is no evidence in the legislative history or elsewhere that it was intended or considered." (*Ibid.*)

3. Appellants' Additional Arguments Are Unpersuasive

Appellants raise additional arguments in support of their position, but we do not find them persuasive. Appellants' primary argument on appeal is that we are bound by our Supreme Court's decision in *ITT,* which, they contend, held that Section 19 requires utility property to be taxed at the same rate as common property. On this point we again agree with our sister courts: *ITT* did not hold that Section 19 requires rate equality—its single remark about property tax rates was "dicta and not precedent." (*Merced*, *supra*, 109 Cal.App.5th at p. 853; *Santa Clara*, *supra*, 87 Cal.App.5th at p. 371; *Napa*, *supra*, 112 Cal.App.5th at p. 964.)

The issue in *ITT* was "whether the 'valuation rollback' provision of . . . [Proposition 13] applies to unit taxation of public utility property."[4] (*ITT*, *supra*, 37 Cal.3d at p. 862.) In that case, ITT World Communications, Inc. (Worldcom), a public utility, sought to apply the rollback provision to the property taxes it had paid to the county. (*Id.* at p. 862.) The Court concluded that the provision did not apply to utility property because the provision expressly applied to the valuation of "real property" only, and utilities are not treated as real property for valuation purposes—they are valued as a "going concern." (*Id.* at p. 865 [noting that the Board's allocation of a utility's value

---

**4** As noted above, the valuation rollback provision limits the assessment of "real property" to its fair market value in 1975 or its later date of acquisition, with future adjustments capped at two percent. (Cal. Const., art. XIII A, § 2; *ITT*, *supra*, 37 Cal.3d at p. 862.)

30

to local taxing authorities "does not even attempt to match the allocation to the fair market value of the particular assets of the utility situated within the jurisdiction"].)

Having concluded that the valuation rollback provision of Proposition 13 does not apply to unit taxation of public utility property by its plain terms, the Court turned to Worldcom's additional arguments, which included the utility's contention that the rollback provision applied to utility property "indirectly through the operation of article XIII, section 19." (*ITT*, *supra*, 37 Cal.3d at p. 869.) Specifically, Worldcom argued that "by requiring public utility property to be 'subject to taxation to the same extent and in the same manner as other property,' [Section 19] requires public utility property to be *valued* on the same basis as other property, and thereby effectively applies the valuation rollback provision to the unit taxation of public utility property." (*Id.* at pp. 869–870.) The Supreme Court disagreed. (*Id.* at p. 870.) It explained that Section 19's purpose was to "authorize the unit taxation of public utility property" and to assure " 'adequate valuation of utility property.' " (*Ibid.*) The Court then stated: "By requiring that public utility property be 'subject to taxation to the same extent and in the same manner as other property,' [Section 19] does not impose a requirement of equal valuation between public utility and other property, but simply specifies that public utility property, after it has been placed on the local tax rolls, be levied on at the same *rate* as locally assessed property, instead of being subject to a special gross receipts 'in lieu' tax." (*Ibid.*)

Appellants argue that the Court's use of the words "same rate" in its rejection of Worldcom's argument constitutes a binding holding that Section 19 mandates that utility

31

property be taxed at the same rates as common property. We disagree. " 'Dicta consists of observations and statements unnecessary to the appellate court's resolution of the case.' " (*Sonic-Calabasas A*, *Inc. v. Moreno* (2013) 57 Cal.4th 1109, 1158.) *ITT* concerned the valuation aspect of unit taxation, not the rate formulation aspect. As such, the Court "was not asked to—and did not—analyze or interpret" the second sentence of Section 19. (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 370.) *ITT*'s passing description of how taxation works under Section 19 is dicta because no issue concerning rates was before the Court and because the description was unnecessary to the Court's resolution of whether Proposition 13's valuation rollback provision applied to utility property. (*Napa*, *supra*, 112 Cal.App.5th at p. 980 [explaining that "rate equivalency under the second sentence of . . . [S]ection 19 was not the controversy presented to the *ITT* court, let alone analyzed in any depth in the opinion itself"].) In other words, as soon as the Court determined that the second sentence of Section 19 did not require equal valuation as between utility and common property, the Court was able to reject Worldcom's argument about the indirect application of the rollback provision. Because cases are not authority for propositions not considered, we conclude that the statement at issue "is dicta and does not determine the resolution of the question before us." (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 371, citing *People v. Baker* (2021) 10 Cal.5th 1044, 1109.)

Furthermore, we agree with *Napa* that, in addition to not being binding, the statement also does not present persuasive or " 'compelling logic' " helpful to appellants' interpretation of Section 19. (*Napa*, *supra*, 112 Cal.App.5th at p. 980.) This is "because the language that follows the 'same *rate*' remark (citation [('instead of being subject to a

special gross receipts "in lieu" tax']) does not conceptually pertain to rates at all." (*Ibid*.) Thus, the "sameness" *ITT* was describing was the "placement of state-assessed utility property on local tax rolls alongside locally assessed property, as distinguished from the prior separation of sources system in which public utility property was subject to a special in-lieu tax levied and collected by the state to support state government." (*Id.* at p. 965.)

Next, appellants argue that their interpretation of Section 19 is compelled by section 1 of article XIII of the California Constitution (Section 1), which, they contend "has always contained a general requirement for uniformity and equality in property taxation." Again, we disagree. Section 1 states: "Unless otherwise provided by this Constitution or the laws of the United States: [¶] (a) All property is taxable and shall be assessed at the same percentage of fair market value. When a value standard other than fair market value is prescribed by this Constitution or by statute authorized by this Constitution, the same percentage shall be applied to determine the assessed value. The value to which the percentage is applied, whether it be the fair market value or not, shall be known for property tax purposes as the full value. [¶] (b) All property so assessed shall be taxed in proportion to its full value." (Cal. Const., art. XIII, § 1.)

Section 1 "establishes the general rule that property taxes in California must be ad valorem" and based on the same percentage of full market value (commonly referred to as the "assessment ratio"). (*City and County of San Francisco v. All Persons Interested in the Matter of Proposition G* (2021) 66 Cal.App.5th 1058, 1076.) But Section 1 also contains carve out language that expressly provides for exceptions to that general rule, if

33

those exceptions are "provided by this Constitution or the laws of the United States." (Cal. Const., art XIII, § 1.) In light of the carve out provision, we agree with *Merced* that "the general principle that we should attempt to harmonize constitutional provisions where possible plays no role" in our analysis. (*Merced*, *supra*, 109 Cal.App.5th at p. 862 ["We do not see Section 1 as a significantly helpful interpretive guide in analyzing the language of Section 19, because Section 1 is a catchall that applies only when other provisions of the Constitution do not."].) Because Section 1 states that it applies only when other constitutional and statutory provisions do not provide otherwise, "there can be no disharmony between" it and the unit taxation system set out in Section 19. (*Ibid.*)

As *Merced* observed, Section 1 expressly permits variations in California's ad valorem property tax system, and "[s]uch variations have occurred numerous times." (*Merced*, *supra*, 109 Cal.App.5th at p. 861.) For example, Proposition 13 " 'changed the taxation of real property' " by replacing the " ' " 'fair market valuation standard' " ' " in Section 1 with the valuation rollback provision. (*Id*. at p. 862, citing *RAR2 Villa Marina Center CA SPE*, *Inc. v. County of Los Angeles* (2023) 91 Cal.App.5th 1050, 1063.) In fact, variations exist even among the property tax rates for common property. This is because the debt service component in Revenue and Taxation Code section 93 depends on the TRA to which the property is assigned, and each TRA will have a different amount of voter-approved indebtedness. (*BNSF*, *supra*, 7 F.4th at p. 880.) The carve out language in Section 1 means that "[t]here exists no 'iron rule of equality, prohibiting the flexibility and variety that are appropriate' to schemes of taxation." (*Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization* (1978) 22 Cal.3d 208, 234.)

34

Even "the fact that two taxpayers may pay different taxes on substantially identical property is not wholly novel to our general taxation scheme." (*Id.* at pp. 235-236.) For these reasons, we reject appellants' claim that Section 1 supports the conclusion that Section 19 mandates equal rates between utility and common property.

Next, appellants argue that to agree with the holdings of our sister courts is to ignore "the unbroken historical understanding of Section 19 as requiring that utility property be taxed at equal rates as other property." But as the County correctly points out, all of the historical documents that appellants rely on were drafted between 1934 and 1979, which means the documents pre-date the enactment of Revenue and Taxation Code section 100 and the creation of a countywide TRA for utilities. Appellants do not cite any documents drafted after the enactment of that statute indicating that public officials believed that the Legislature's choice to create different debt service component formulas for utility and common property violated Section 19. Indeed, the legislative history of Revenue and Taxation Code section 100's predecessor shows that the Legislature was aware that the new formula for calculating a countywide debt service component would produce unequal tax rates for utility and common property. At the time, however, the inequality was understood to benefit utility properties. In an enrolled bill report, the Department of Finance advised the Legislature that the new formula would "reduce the amount of property taxes for debt service paid by owners [of] unitary . . . property assessed by the Board of Equalization" and "would increase the amount of property taxes paid by other owners of secured property." (Dept. Finance, Enrolled Bill Report on AB No. 4062, Aug. 9, 1988 at p. 1.) Despite this known disparity, there is no suggestion in

35

the legislative history that the new formula would violate Section 19, Section 1, or any other constitutional provision.

More importantly, however, even if appellants could point to historical documents demonstrating that various public officials interpreted Section 19 to require that utility property be taxed at the same rates as common property, such documents would not impact our interpretation of the provision. This is because it is the intent and understanding of the voters who enacted Section 19 that matters, not the understanding of public officials after the provision's enactment. (E.g., *Silicon Valley Taxpayers' Assn., Inc. v. Santa Clara County Open Space Authority* (2008) 44 Cal.4th 431, 448 [Courts must construe constitutional provisions "in a manner that effectuates the [enactors'] purpose in adopting the law."].) We therefore respectfully reject appellants' argument that if we agree with our sister courts we will be breaking with "90 years" of a common understanding of Section 19.

Finally, we have reviewed the California and out-of-state decisions that appellants cite in support of their interpretation of Section 19. We find those decisions unhelpful to our analysis because they do not concern unitary property tax rates or the provision of Section 19 at issue here. We are aware of only one other decision involving unitary property tax rates—*BNSF*—and that decision, if anything, lends support to our interpretation of Section 19. In *BNSF*, the Ninth Circuit concluded that Revenue and Taxation Code section 100's countywide debt service component formula, as applied to certain railway companies across the state, violated the Railroad Revitalization and Regulatory Reform Act of 1976 (the "4-R Act"), a federal law enacted to protect railroad

36

companies from " 'discriminatory state taxation of railroad property.' " (*BNSF*, *supra*, 7 F.4th at p. 879.)  That protection took the form of a mandate expressly directed at the rate of property taxation:  The 4-R Act prohibited state and local governments from levying " 'an ad valorem property tax on rail transportation property at a *tax rate that exceeds the tax rate* applicable to commercial and industrial property in the same assessment jurisdiction.' " (*BNSF*, *supra*, 7 F.4th at p. 879, italics added, quoting 49 U.S.C. § 11501, subd. (b).)  In our view, it is the absence of any kind of express reference to rates that distinguishes Section 19 from the 4-R Act.

For all of these reasons, we agree with *Santa Clara's* conclusion that (1) the phrase " 'to the same extent' " means that utility property "shall be subject to ad valorem taxation at its full market value, rather than via the previous method of gross receipts in-lieu taxation that failed to capture its full value . . . and contributed to the local tax burden," and (2) the phrase " 'in the same manner as' " means that utility property "shall be subject to taxation by the local jurisdictions just as other property is, rather than by the state, as it had been previously." (*Santa Clara*, *supra*, 87 Cal.App.5th at p. 369.)  We therefore conclude that the trial court correctly determined that Section 19 does not prohibit the Legislature from enacting different debt service component formulas for utility and common property and does not render the County's challenged tax rates unconstitutional.

DISPOSITION

The judgment is affirmed.  Respondents shall recover their costs of appeal.

CERTIFIED FOR PUBLICATION

                                                            FIELDS                    
                                                                                  J.

We concur:



RAMIREZ                    
                    P. J.



RAPHAEL                  
                    J.

RAPHAEL, J., concurring.

I join the opinion in full and offer the following observations.

I

Pacific Bell here relies on a state constitutional provision to seek something that is impossible under that provision within the current system of utility taxation.

The complaint seeks damages for excessive property taxes "illegally levied . . . at a rate that violates the California Constitution." The complaint summarizes the problem it attacks this way: "In short, [Pacific Bell's] tax rate, and thus their tax liability, [was] calculated under a *different formula* from the tax rate for most other property in California." (Italics added.) "[T]he difference in those formulas" has led to a higher tax rate on Pacific Bell than on local property in Riverside County.

The complaint emphasizes the "formula" because it relies on a constitutional provision that is about the *process*, or formula, used in property taxation. That is, the Constitution requires that utility property "be *subject to taxation to the same extent and in the same manner* as other property." (Cal. Const. art. XIII, § 19.)

The rate *could* be embedded in the process, and it probably was 90 years ago. When the electorate enacted it in 1933, the "same extent . . . same manner" provision addressed the Constitution's fresh assignment to the state Board of Equalization (Board) of the task of assessing utility property. Previously, counties (not the Board) had taxed utilities based on gross receipts (not by assessing value). (*Southern California Telephone*

1

*Co. v. Los Angeles* (1941) 45 Cal.App.2d 111, 114.)

Upon enactment, the "same extent . . . same manner" provision applied to the state's new, centralized process of assessing utility property at its "actual value." (Cal. Const. art. XIII, § 14 (1935).) The provision ensured that even though the property would be assessed by the state, it would be "taxed locally for local purposes as other property" as the voters were assured in the brief summary of the amendment for the ballot. (Ballot Pamp., Special Elec. (June 27, 1933).) That is, the property would be "subject to" taxation by localities, in the same way that localities tax other property.

By its terms, the provision may have had procedural application beyond just ensuring localities received the revenue. At the 1933 enactment, only about 25 percent of local properties' actual value was subject to taxation, so the provision likely required that state-assessed utility property was taxed to the "same extent." (Bertrane, *The Assessment of Public Utility Property in California* (1973) 20 UCLA. L.Rev. 419, 421, fn.13; Flavin, Taxing Cal. Property (4th ed. 2024) Assessment Ratios and Tax Rates, § 9:1 [in 1951, the Board estimated "statewide average ratio of assessed to market value was about 28 percent, but individual county average ratios ranged from 17% to 32%"], footnote omitted.) Also, from the enactment through the 1980s, the Board placed the assessed utility property into small local taxing districts throughout the state in the same manner as local property by seeking to reflect its presence in the districts. (Bertrane at pp. 425, 443-445.) It did so on a determination of how much "system value" of the utility property was in the local jurisdiction based on the "use, amount, or productivity" of it there. (*Id.*

2

at pp. 443-444.)  As well, the requirement that state-assessed property is subject to taxation in the same manner presumably means it is subject to the same administrative machinery as locally assessed taxes, including notices, deadlines, and penalties.

In that system, which lasted about 50 years, the *rate* may well have been part of the formula guaranteed by the "same extent . . . same manner" provision, though the issue likely would not have arisen.  Local taxation districts are *defined* by the property tax rate they need to apply, due to the debt service from bond measures to which they are subject. A local tax jurisdiction might be defined by overlapping indebtedness from a county bond, a city bond, and a school district bond.  Their property tax rates are set by the amount of funds needed to service the debt.  It seems unlikely that local taxation districts would consider employing disparate rates for property they tax.  Like local property in a district, the utility property placed in a district was taxed at the applicable rate. Accordingly, in the case law, it was simply treated as a factual matter that, after the state assesses utility property, "the local taxing authority subjects the property so assessed to taxation at the rate fixed in its jurisdiction."  (*ITT World Communications, Inc. v. City & Cnty. of San Francisco* (1985) 37 Cal.3d 859, 864; *So. Cal. Tel. Co. v. City of Los Angeles*, *supra*, 45 Cal.App.2d at p. 114 ["The property so assessed is then subject to taxation locally at the rates fixed for taxation of property in the respective taxing jurisdictions"].)

In the last four decades, our system has differed.  There is no precise rate that must apply to utility property to treat it in the "same" manner as local property.  The current

3

system emerged because, by the mid-1980s, in some counties, a utility might receive bills from about 600 local taxation jurisdictions. To simplify the system, by unanimous legislation effective in the 1988-1989 fiscal year, the state determined that it would place all utility property in countywide taxation districts. (Assem. Bill No. 454 (Stats. 1987, ch. 921, § 1); see Rev. & Tax. Code § 100, subd. (a).) It then provided a formula for counties to calculate a single rate for the property in the entire county. In the current system, local property is placed in the local tax district in which it is located, but utility property is placed in countywide districts.

Pacific Bell wants us to apply the constitutional "same extent" and "same manner" provision to invalidate the countywide rate that Riverside County calculated in recent years using the statutory formula. In the current system, though, utility property cannot be taxed by the *same* formula that applies to parcels of local property. Local property is placed in the local taxation jurisdiction where situated and is taxed by the formula defining that jurisdiction; utility property is placed in a single-rate countywide district. A different formula *must* be used for utility property.

Here, Pacific Bell raises no constitutional challenge to the countywide assignment of utility property for rate-setting. For everyone involved, it is likely that assignment is preferable to utilities receiving thousands of bills from local taxation jurisdictions throughout the state. The legislative history reflects that the switch to countywide districts was made with the support, if not at the behest, of utilities. A letter to the Governor from the author of the bill that made that switch stated that the measure had "no

4

known opposition" and enjoyed the support of "the Santa Fe Southern Pacific Corporation, San Diego Gas & Electric, the California Telephone Association, General Telephone Company and several county auditors." (Assemblyman Johan Klehs, letter to Governor George Deukmejian, September 14, 1987.)

A single countywide district for utility property continues the state constitution's guarantee that the property will remain subject to taxation by localities, rather than by the state. But placement in a single-rate countywide district means it is impossible to formulate the utility property tax rate in the "same manner" as the rate for local property. That is, since the 1980s, the state has decided *not* to treat utility property in the same manner at that rate-setting stage. The process results in a single rate for all the utility property in a county, rather than disparate rates that apply to local property taxed where situated.

Pacific Bell's complaint is based on a theory that the formula for a countywide district must be the "average property tax rate" in the county for the year that the utility property is taxed. It seeks damages for amounts imposed above the result from that formula, as it seeks our declaration that collection "in excess of the average property tax rate in the County violates section 19 of Article XIII of the California Constitution."

Ordering trial court review of this sort would press the "same extent . . . same manner" clause into a different type of role than it could have had at its enactment. Not only is Pacific Bell's "average property tax rate" not the "same manner" in which local property is taxed, it is not even the "same manner" in which utility property was taxed

5

from 1935 through the 1980s.  Local property has for the last 90 years been taxed at rates tied to its placement in local taxation districts where it is situated.  The Board used to allocate utility property in the same manner but hasn't done so for decades.  The state's decision to allocate utility property in a different manner means that the rate must be calculated in a different manner.

Rather than treating utility property in the same manner as local property, adopting the complaint's view would have courts review the *results* of the utility taxation formula against a rate measure that we have selected—county-by-county, year-by-year.  The statutory formula might produce a constitutional result at some times in some places but not in others.  This is not ensuring that property is "subject to taxation" in a particular manner; it is determining whether the results of a tax formula are tolerable.

## II

Pacific Bell's policy argument is compelling insofar as it asserts that its single countywide rate should be calculated so it pays roughly the amount on its state-assessed property as it would have paid had its property been apportioned to local taxation districts within the county.  This seems to be what the Legislature intended.

In describing the bill that enacted the rate-calculation statute in the 1987-1988 legislative session, the legislative analyst stated, "the countywide rate essentially represents an average of the tax rates in the county."  (Assem. Com. on Ways and Means, Analysis of Assem. Bill No. 454 (1987-1988 Reg. Sess.) as amended Mar. 23. 1987.)  The analyst expected the bill to "have no effect upon the current amount of property tax revenue collected

6

by the counties."

But a countywide rate can be formulated in several ways, and the Legislature focused on how to do so. The year after enacting the formula, the Legislature changed it. (Assem. Bill No. 4062 (1987-1988 Reg. Sess.; Stats. 1988, ch. 571, § 2).) The legislative history states that taxation experts "struggled" over how to handle utility property in the new system and changes were needed to address "complex issues" left over from the previous year. (Sen. Local Gov. Comm. June 23, 1988.) The primary reason for changing the formula was equity among the state's utilities. Utilities in rural local tax districts found the calculation led to a higher rate than they used to pay, but utilities in urban districts benefitted from a lower rate.[1] The solution involved calculating the component of the countywide tax rate based on the debt rate of the utilities only, not of all the property in a county.[2] The legislative history indicates a belief that with the changed formula, sometimes the countywide rate would rise faster than the

---

[1] "[C]urrent law requires county auditors to compute a single tax rate for bonded debt and apply it countywide. But utilities whose property is located in rural areas find that this average rate is higher than the actual tax rates they used to pay for bonded debts. Conversely, utilities in urban areas with actual rates higher than the newly computed average rate end up paying lower property taxes." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 4062 (1987-1988 Reg. Sess.) as amended Aug. 9, 1988.) A document in the legislative history says, "Two utilities who studied the effect in depth showed $2.5 million and $2.6 million more in tax per year."

[2] "The bill requires county auditors to use unitary and operating nonunitary property information instead of countywide information . . . ." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 4062 (1987-1988 Reg. Sess.) as amended Aug. 9, 1988.)

7

rate on other property but sometimes it would decrease at a faster rate.[3]  Because experts

"seemed to agree" that a changed formula would "promote tax equity,"[4] the Legislature

amended the formula to its present form.  (Sen. Rules Com., Off. of Sen. Floor Analyses,

3d reading analysis of Assem. Bill No. 4062 (1987-1988 Reg. Sess.) as amended Aug. 9,

1988.)

I am not commenting on the merits of the formula.  Rather, my point is simply that the

Legislature grappled with how to enact one.  Choosing a formula appears to have been a

complicated policy matter shaped by a desire to greatly simplify utility taxation; have utilities

shoulder the correct share of the property tax burden; and maintain equity among utilities.

Once utility property is treated in a different manner than local property by placing it in

countywide districts, there is no unique "same" formula for utility property that must be

adopted to mirror the manner in which counties tax local property with varied rates.[5]  Under

_____

[3]  "In counties where that percentage [change in the levy for debt service of local property] was rising, the rate for debt service on unitary and operating nonunitary property would increase at a faster rate than that of other secured property.  Conversely, in those counties in which the rate for debt service was decreasing, the tax rate would decrease at a faster rate."  (Finance Dept. on AB 4062, 1988)

[4]  The legislative history contains a May 27, 1988, letter providing proposed language for a formula and sample calculations from Pacific Gas & Electric Company's director of property taxes.

[5]  Timing of tax bills may complicate counties' practical ability to implement a calculated rate declared by the courts, such as the complaint's proposed average property tax rate.  Currently, utility payments must be calculated based on prior-year information, before setting the current year rates for local property. (See Rev. & Tax. Code § 100, subd. (b)(2)(A); Gov. Code § 29100, subd. (a).)  To ensure that utilities are paying their share of the current year debt payments, there are various ways that the system could

*[footnote continued on next page]*

8

Revenue & Taxation Code section 93, local property tax jurisdiction rates are set by the debt service from bonds that include the area where the property is situated. The County of Riverside's auditor-controller lists about 17,400 line items on its spreadsheet used to calculate taxes on individual parcels in hundreds of tax rate areas in the county. The rates from 2024-2025 include, for instance, a rate of 1.372 percent in part of the City of Banning and a rate of 1.0286 percent from a district in the City of Wildomar, among hundreds of rates for the tax rate areas in a county of about 2.5 million people.

Pacific Bell's complaint here bases its damages claim on "the average property tax rate in the County, as reported by the State Board." It uses that "average" property tax rate to seek damages for amounts paid above that average. The "average" appears to be a linear average, as the complaint asserts no description of how it was calculated; a linear average is simply the various rates in the district treated equally in an average (i.e., the sum of the rates divided by the number of rates).

The linear average of numerous intra-county rates is a formula that the Legislature *could* use to tax utility property, or as part of a formula. But it is not the "same" formula used for local property, and it is not even the only formula that could treat utility property roughly the same as local property. The legislature could use *weighted* averages of the local rates in a county, by assigning weight to the rates in intra-county tax jurisdictions based on population, amount of property, or property value. Or it could distribute utility

_____

attempt to capture whether local taxes overall are increasing or decreasing, one of which is used in current law. (Rev. & Tax. Code § 100, subd. (b)(2)(B).)

9

property to local taxation districts "on paper" as in the former system and calculate a unitary countywide rate with that distribution.  The current statutory formula takes a yet different approach, starting with each county's utilities' debt payment rate for the last year (Rev. & Tax. Code § 100, subd. (b)(2)(A)) and adjusting for the change in local property taxes in the two preceding years (Rev. & Tax. Code § 100, subd. (b)(2)(B)).

The Legislature's current formula has been effective since the 1988-1989 tax year, over 35 years ago.  That means it has been used over 2,000 times to make an annual countywide calculation in the 58 counties during that period.  This complaint here concerns a few years in one county.  It may well be that, in the aggregate, the results of the Legislature's choice diverge too far from a proportional share to provide utility property with roughly similar treatment as local property.  But because there is no rate or rate formula that is definitively the "same" as the amalgam of rates in a county, a court cannot invalidate the formula, or occasional results of it, by finding a violation of Article XIII, Section 19.  The Legislature must determine what approach, over time, will best lead to utilities shouldering the desired share of the debt burden, as well as maintaining equity among the state's utilities, if that policy goal remains.  In the current system, the selection of a countywide rate for utility property is a policy question for the legislature, not a constitutional question for courts.

RAPHAEL

J.

10